The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Be seated. Our third case is Clehm, if I'm pronouncing that right, versus BAE Systems Ordinance. The Radford Arsenal case, I guess we can call that. Mr. Grimes? Yes, Your Honor, good morning. Good to have you here, sir. Good to see you, Judge. And yes, I think the Radford Arsenal case is a good way to describe it. That's what we call this work facility in Southwest Virginia. We all call it that. The overarching problem with the district court's ruling in this case is that it viewed the sexual assaults and batteries not as part of the overall hostile work environment. If I were drawing a Venn diagram, an air diagram, he viewed the assault and batteries here and the hostile work environment, which he didn't discuss at all, as here. When we think the assault and battery is part of an extension of the hostile work environment. Secondarily, the district court looked at the evidence in the light most favorable to BAE and contravention of Rule 56 in cases such as Toland versus Cotton. We're here, of course, talking about the fourth element of a hostile environment claim. There may be no work environment like the one that existed at the Radford Arsenal. It's off the charts. There's nothing like it in our case law. There was a culture of sexual promiscuity there that is unheard of. There was a sex ring there. Some of the female employees regularly provided sex to hourly workers and members of management. Things were so bad that the sounds of people moaning and having sex could be heard behind closed doors. In a word, it was like Sodom and Gomorrah in a federal munitions plant. They're charged with making TNT. If you were a woman like Carla Cohen and not part of the sex ring, the work environment was hellish. Men would line up at work to have sex with Stacey Lankes, who's the wife of the perpetrator here. Everybody knew about it. It was common knowledge. Stacey Lankes bragged about it and said that she had sex with 15 men at work. This created an extremely hostile work environment for people like Carla Clem and Flo Bishop and women who wanted no part of it. Joss Lankes was deposed, and he said, quote, Everybody is screwing everybody, close quote. When Flo Bishop was asked by my colleague, who's in the courtroom, what was going on with the sexual entities there at work, she said, answer, a lot, a lot of sex. And she said Stacey Lankes was very proud of the fact that at that point she'd done 15 guys that we worked with in the plant, in the plant. When Flo Bishop testified about a potential reprimand by a supervisor named Daryl Lover, a member of management who goes by Loopy, Stacey Bishop said, He ain't going to get nobody. I just gave him a blowjob in the breaker room. So that's what the work environment was like there. And she went on to say, Flo Bishop, I heard the sounds of sex, the moaning, the groaning. Then we got an objection to the form of the question, the sounds of people having sex there. So that's what the work environment was like there. And Flo Bishop also said that Stacey Lankes bragged about the sale of men's workers' penises which in context of everything else we're talking about is relatively minor and talking about having anal sex at work. Then when Flo Bishop complained to management, all management did is report it right back to Stacey Bishop, excuse me, Stacey Lankes, who went to Flo Bishop and said, You ain't seen bitch yet because she was reported. This is, in our view, is probative of a dysfunctional anti-harassment policy. And in the words of this court in Smith v. First Union National Bank, that alone is sufficient to impute liability to the employer. In our view, the evidence I've just told you about is not even mentioned in the district court's opinion. Now, in fairness to the district court judge, I digress for just a moment. We've been down a judge a long time in the Western District. I have an eight-week jury coming up with Judge Hrabanski beginning October 7th. Our judges are overworked and underpaid. We need another judge. I've written to Tim Kaine. I've written to Mark Warner. That's a subject for another day, but we're down a judge. Our judges are very busy. Under our jurisprudence, sometimes the harassment is so pervasive or severe that a jury may find that a reasonable employer would have notice of it. In Alexander v. Alcatel, this court said, and I'm quoting, in certain circumstances, an employer whose tepid response to complaints of sexual harassment emboldens would-be offenders may be liable if vigorous response would have prevented the same. And again, this court said, to quote from Paroline, that's Paroline v. Unisys Corporation, the law imposes a duty on the employer to take adequate steps to try to prevent harassment, not merely to act after the event, but here we have members of management sleeping with hourly workers, including a member of the ethics committee to whom you're supposed to report sexual harassment. Women like Flo Bishop and Carla Klem really didn't have a chance. An employer cannot avoid liability by adopting a, quote, see no evil, hear no evil strategy. Vance v. Ball State ought to control disposition of this question. There the Supreme Court said, assuming the harasser is not a supervisor, and look, I'm going to concede, you have not asked me yet, that Linkus was not a supervisor under Vance, under Michaels v. City of Durham, I think, which is our controlling law here. I think we have to conclude that he's not a Vance supervisor. He had supervisory authority, but not a Vance supervisor. The district court found, though, at page 16 of its opinion that the position is non-managerial, that it's an hourly production role devoid of typical supervisory functions. That's a finding of the district court, is it not? Yes, it is. And you're accepting that? Yes, we do. In full? Yes, we do. Yes, we do. I think we have to judge Kenan under Michaels v. City of Durham and Vance v. Ball State. Don't need to decide that point. We concede that point. But under Vance v. Ball State, the Supreme Court said, assuming the harasser is not a supervisor, which is what we have here, a Vance supervisor. When I use the word supervisor, I use it in the vernacular, not in the legal sense of Vance v. Ball State. A plaintiff could still prevail by showing that his or her employer was negligent in failing to prevent harassment from taking place, evidence that an employer did not monitor the workplace, which is exactly what we have here, failed to respond to complaints, failed to provide a system for registering complaints or effectively discourage complaints from being filed would be relevant. And in conclusion, the Supreme Court said, and I'm quoting, an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment. A word about geography just for a moment because I know none of you have been to the Radford Arsenal. It's an 8,000-acre enclave, a federal enclave, sits on the banks of the New River. There are tub houses there. That doesn't do justice to what they are. They're football-sized buildings. Inside those buildings are huge tubs of explosives being made. Each tub is 17 sticks of TNT or dynamite, so they spread them apart in case one blows and people were killed there from time to time. Maybe the whole place would not be blown to smithereens. That's the work environment there. So back to the law. Did they build that in World War I? 1941. 1941. 1941, and at the beginning of World War II, just as we entered the war, they built the facility. Yes, Judge. And it's been managed over the years by a series of contractors. BAE has the current contract. Before that, it was ATK, also known as Alliance Technologies. But some of this stuff goes back to the ATK days. BAE took over the contract in 2011 or 2012, to answer your question. Would you list for us in the allegations and in the evidence what is in the record about the employer being negligent in controlling the working conditions? You've given us a lot of quotes about what was going on there. But what went back to the employer? If you could distill that for us, I think it would be helpful. Yes. Yes. Well, first, members of management were having sex with the hourly female workers, and that's in, for example, the Joint Appendix at 1619 through 1621, right in there. And you're saying there's a necessary relationship between that kind of activity and a hostile work environment vis-à-vis employers working on the floor? Yes. This is a military-style operation. All of the employees who receive word of sexual harassment are required to pass that up the chain. But you're talking about a consensual effect, the management, or you're not? It was sex. I assume it was consensual, whether it was for money or she could get ahead at work. And, you know, no question, you've been giving us a bizarre story. I mean, a bizarre set of facts. I mean, you know, it's sort of off the charts. But what I'm trying to do is distill what you're saying to what management should have known. And you're saying that just because management engaged in sexual activity with one or two workers, they should have known that this rampant activity was going on on the workplace premises? And the fact, Judge Kainan, that the—  The fact, that's part of it. Mm-hmm. Part of it. Perhaps if you all answer questions. I mean, I know we've had that earlier on these cases, but lawyers don't like to. But sometimes, but it really helps us and speeds things along. Okay. So, yeah, so what's laid at the feet of management here? You say, first, the fact that management itself was engaging, members of management engaging in sex in one or two instances. Now, what else? Is that—put the employer on notice that this kind of activity was so pervasive and so outrageous? First, the people who were having sex, or any knowledge of sex harassment, have a duty to report that up the chain in the military style of this organization. So that's one way. Second, according to Joshua Lincoln, there was no sexual harassment training. And under Smith v. First Union National Bank, that alone, this court said, that's sufficient to impute liability to the employer. That gets you past the fourth element. Had Ms. Clem completed the trainings there, which explained how to report workplace problems? She did. Okay. She did. And those trainings do not say that it suffices to tell a friend, right? To tell a friend. She told her vernacular supervisor. Not a legal supervisor. Not advanced supervisor. Yes, not advanced—she told her supervisor. She thought she was doing exactly the right thing. And the person right above—and that's—you're talking about the sexual assaults that occurred in May and June of 2014. Everything I've been describing occurred before then. And she immediately—well, first of all— I'm just trying to—and I might be a little slow on this. I'm just trying to connect what you're talking about to the claims you made. Hostile work environment. Right. It's right in the complaint. We complained about a hostile work environment. And what ruling of the district court do you complain about? Pardon? What ruling of the district court do you complain about in that regard? We complain that the district court found that—well, first of all, it overlooked all the evidence I've just described to you, which is prohibited by Alexander v. Alcatel. You have to consider it. You might reject it, I guess, maybe, but you have to at least consider it. That's why this court reversed Alexander v. Alcatel. The court didn't even consider this evidence. All right. So, again, you can't have a see no evil, hear no evil strategy. That's what this court said in Howard v. Wenner. And they're supposed to at least monitor the workplace, Judge Goodwin, and they didn't do that because the people who were charged with receiving complaints of harassment, like L.A. Woods, like L.A. Woods, like Loopy, Loopy was right above Ms. Klam's supervisor. Loopy was getting blowjobs from Stacy Flinkus. So you understand why he didn't report anything. He's supposed to report that up the chain. Okay? So, I mean, that's it. She could have reported it to somebody else. The thing that's bothering me about this, Mr. Grimes, is that we, I mean, essentially you're relying on a constructive knowledge, aren't you? In part. Only in part. Yes, yes, only in part. Yes, only in part. Well, what's the other part? Actual knowledge? Actual knowledge. Actual knowledge of management who is supposed to report it up. Who would they report it to? Arlington? What's the it? Hmm? What's the it they're going to report? The it. Yes, sir. Report it. The people are having sex. I can't get my work done because of the sound of people having sex. And when it finally, and understand that when it finally, the worst of it, the worst of it from my client's perspective was the sexual assault and battery. Because then it became terribly personal, obviously. Well, and that dealt with here. Hmm? And the judge dealt with that. He did. After the sixth assault, after the sixth attack by Joshua Lankes, and after my client, the whistleblower, goes to the FBI and the FBI comes in there, the employer fired Joshua Lankes. He's in federal prison now. It should have been done well before that in our view. And also there's the afterwards. After, after. I'm going to interrupt you because I'm really having a hard time. Yes, sir. I'm trying to deal with the facts of this case and the complaints that you make on behalf of Ms. Clamp. Yes. And I want to know what it is that you say the employer did that they shouldn't have done under the law. They should have. As to Ms. Clamp. Yeah, they should have. That's in, right, that's in count one, the count one. We talk about the hostile work environment there. The employer is supposed to act, and I've just cited the case law, to prevent. What did the judge decide as to that? The judge said the employer, the judge said it's the defense that the employer fired Joshua Lankes. End of, end of opinion. The judge didn't look at any of this other evidence. That's what he said. No, I don't think, I don't think that's what Judge Urbanski said. Judge Urbanski said that, at least as I understood his opinion, that the plaintiff, Ms. Clamp, told Brunk about what was going on. Brunk said you've got to report this right away. Right. Those were the words. And she didn't. The sexual assault, yes. Okay. And when the employer did find out about it, Lankes was shown the door. Right. I mean, they got rid of him. Right. And, in fact, when there were later complaints that she made regarding a couple of other employees, lesser incidences, if you will, they found her other positions within the organization. So I think that it would be really helpful if you could just give us a summary of what the employer should have known based on the information, not just based on the general atmosphere of the place, but based on what was going on with regard to Ms. Clamp. Ms. Clamp and the sex ring, the employer should have investigated. The employer should have investigated when Flo Bishop reported. Now, this was in September of 2014, that this had been going on as early as September of 2013, and maybe back to the ATK days. The sex ring, people like L.A. Woods, who received complaints of harassment, shouldn't have laughed about it and reported it on to Arlington or wherever a BAE is headquartered. That's what should have happened here. BAE should have come in and investigated. They should have monitored their workplace, just like the Supreme Court says in Vance v. Ball State University. So if nobody tells you as an employer about the situation, you still have to monitor for sexual activity? Is that what you're saying? Joshua Lincas said the employer had no sexual harassment training. It's one thing to have a policy.  I'm saying that you're saying that there is an independent duty to monitor a workplace for sexual activity if you are not being put on notice that these activities are taking place? Yeah, that's what the Supreme Court said in Vance v. Ball State. Could you give us a page site for that proposition? I can. It's 133 S. Court 2434 at page 2453, the 2013 opinion. That's what the Supreme Court said. Said what? Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints being filed is relevant in determining whether liability should be included. My question was different, though. It was whether the employer has an independent duty to monitor the workplace for sexual activity. It does, according to the Supreme Court in Vance v. Ball State. It says evidence that an employer did not monitor the workplace is a factor that should be considered. That's what the Supreme Court said. So you're saying that every employer in the Fourth Circuit or across the nation has to monitor the workplace for sexual activity? If they're going to assert a – yes, yes. For consensual sexual activity. Consensual? For consensual sexual activity. You're saying they have to monitor for consensual sexual activity. Not generally, not generally. So you're backing off? No, I don't think I am. You are. With respect, Judge King, I don't – there were men lined up – I'm out of my time, incidentally. Well, if we're asking questions, you're not out of your time. Okay. Well, let me – before I move – I'm going to have to stand on my brief with respect to the rest of the state law claims because I'm not going to have time to get to them. But with respect to consensual sexual activity that drives people like Flo Bishop into the psych ward, that causes Carla Clem to be laid off for a year and has her health insurance cut off, Yeah, that's – you can be disturbed by people having sexual activity on the other side of this door to the point that it could affect your work performance. She was assaulted. Your client was assaulted. She was. The guy was fired. There's no doubt about it. She was. And he was. So that's what – and that – to answer your question, Judge Goodwin, or maybe it was Judge Keenan, that was Judge Robanski's ruling. He was fired. End of story. Let's see what they have to say about it. Yes. Yes. They had some time, too. Yes. Mr. Freedman, good to have you here, sir. Good to be here, sir. Thank you. May it please the Court, I'm Frank Freedman representing VAE Systems Ordnance Systems, Inc. I'll call us OSI, Victor Cardwell, and Thomas Winter with me at counsel's table. As to Clem's sex discrimination and hostile work environment claim, the district court correctly concluded that Clem failed as a matter of law to survive summary judgment. But he did not ignore the hostile or so-called hostile work environment. He assumed for purposes of summary judgment that Ms. Clem had met the first three prongs of a hostile environment claim. And then he found, as a matter of law, no basis for the fourth prong, the prong of imputing liability to OSI. The reason for that is OSI first learned of Josh Linkus' misconduct while investigating allegations made against Linkus by a different employee, Cynthia Quisenberry, in late July 2014. And the record confirms, until Quisenberry, no one reported problems with Linkus or told anyone in HR about Linkus' assaults. Once management was informed, its investigation was thorough, swift, effective, and Linkus never set foot on the property again. Here, the harassing employee was Ms. Clem's coworker, not a supervisor, so the employer is liable if it was negligent in controlling work conditions. And to establish that negligence, Clem has to show that OSI knew or should have known about the harassment. And the district court correctly found this was a burden that plaintiff could not meet because, under the case law, Ms. Clem's failure to report and the existence of the employer's effective reporting mechanism defeat the claim. An employee claiming coworker harassment bears significant responsibility in notifying the employer because you can't stop what you don't know about. That's Barrett, that's Howard v. Winter, EEOC v. Xerxes. So she didn't report it, and she admitted she didn't report it. JA 11-34-35, 11-41-45, 9-24-925. And now counsel basically raises three arguments for trying to excuse her failure and everyone else's failure to report. And her brief argues these three things. First, that the policy was useless and dysfunctional. Second, that she somehow did comply with the policy by telling her coworker, Brunk, about the incident. And third, that OSI had constructive knowledge because Linkus's actions were so well known, although today and in the briefs, it's that the hostile environment, the sex ring, which involved one woman, was well known. That's not true at the outset, but let's take these in turn, and none of the arguments has any merit. Let's start with the claim that the policy was useless and ineffective, which is consistent with plaintiff's see-no-evil, hear-no-evil mantra that they've used throughout the case. And the facts of this appeal in particular show that the hear-no-evil, see-no-evil jargon is extremely inapplicable to Ms. Klim's situation because, first, OSI reached out to Klim. She didn't report the trouble with Linkus at all. OSI management reached out to all the women in contact with Linkus after learning of the attack on Quisenberry on July 28, 2014. They didn't stop at Quisenberry, and they could have. They had enough to fire, but they thoroughly reached out to everybody in contact with them. And when they found those victims, they helped them with EAP, which they certainly gave Ms. Klim, with benefits, with leave as much as you want, which they certainly gave Ms. Klim, and with follow-ups. Similarly, Ms. Klim's subsequent problems with Mr. Barton and Mr. Kennett, Klim didn't report these initially either. Her supervisor, Rusty Quisenberry, caught a strange vibe, and he wrote it up at JA 650-51 and 3035-3037 when he saw her reaction to being around Mr. Barton. And he went to her. He went to her, and he said, what's going on? And when she told him what was going on, that Mr. Barton had kind of goosed her in the shoulder, for lack of a better word, and that Mr. Kennett had made some inappropriate remarks, both men were suspended, and the evidence is they never bothered her again. Now, Mr. Friedman, Mr. Grimes is saying that the record establishes that there was no sexual harassment training. Do you agree with his characterization of the record? Not at all. And, you know, a lot of his cites are to Josh Link as the man in prison. That's who he was citing to. So basically this record reveals, be it a shift change, an offer to escort her to her car, extended disability leave, EAP counseling, this hear no evil, see no evil thing is really not applicable to her. It's something they're trying to wedge in everything that ever happened at this plant, but it's not applicable to her at all. And OSI's policies worked as to Linkus, as to Barton, and to Kennett. As soon as something was reported, they acted fast, and that's what the judge found. Judge Hrabanski wrote a very good opinion in our eyes. Second, let's address Clem's claim that her coworker, Mr. Brunk, was a supervisor, so she did actually report the incident to management. It's interesting because they've conceded that Josh Linkus, the wrongdoer, wasn't a supervisor, and they're right about that, but these guys, Brunk, basically had the same job. The suggestion that any job with the word chief in it is management rings particularly hollow on this record. The argument is also directly contrary to the holding of Vance v. Ball State, which I'll get to in a little while, but it basically says you have to have the power to make a tangible employment action, and these coworkers, union employees, did not have that. Throughout her brief, Clem attempts to portray the nitrocellulose chief operator, or NCCO position at OSI, as a supervisory position for purposes of Title VII. The job, however, is neither supervisory nor management. Chief denotes essentially a higher hourly pay grade for an hourly union worker. A significant number of OSI's hourly bargaining unit production employees are chiefs, and nearly all the chiefs signed affidavits saying they were not supervisors, including Brunk himself at JA 999 to 1000. Others are at JA 986, 871, 72, 982, 93. In fact, if a supervisor tried to perform hourly work at OSI, the union would file a grievance, JA 485 and 872-73. Does the record show, Mr. Friedman, whether BAE was aware of the fact that Joshua Linkus had been charged with rape previously? Does the record show anything? It does show that he was acquitted something like 20 years before, and that their background checks… How about the domestic violence incident with his wife at work? There's no indication that someone mentioned in a stray comment that he may have been arrested. There's no comment that anything further happened that he actually got charged. But that was back in 2004, 2005. That's another thing I'll get to, but I might as well now. They're trying to dredge up a lot of stuff that happened five years before we ever showed up. BAE took control of this plant in July 2012, and Mr. Grimes conceded that a lot of the stuff they're raising happened while ATK was in charge. And frankly, they argue in their brief it was a seamless transition, but ATK is ATK, and BAE is a different entity. Taking his argument for a minute, there seems to have been an extensive sex culture at the company. There have been at least four victims of sexual assault. How is the company not aware? He would say, don't they have a duty to monitor the work environment when they are aware of all that? Okay. Bottom line, even two of those, and again, he says there were six assaults and four victims. Two of those are long before we got there. Two of those are Lisa Patterson and Jenny Oaks, and JA-799 and JA-2048 shows that happened long before we got there. But the fact is, and we've got all kinds of sites in our brief to it, no one ever saw him. He always struck alone, and the victim, you know, when there wasn't a witness, and none of them came forward. When somebody came forward, we acted very swiftly. But that's what happened. Just getting back real quick to the chief thing, because I do want to bring it home because they argued it so hard in their brief. At JA-500 to 504, there's a list of bargaining unit pay grades. Thirty names of jobs involve chiefs. If chiefs were supervisors, half the workforce would be supervisors. And even Clem conceded that chiefs lack authority to perform any tangible employment actions. That's JA-1174 to 76, and that is the test under Vance. So Mr. Brunk, who she notified, was not a supervisor. Two other quick points on the chief issue. Ms. Clem acknowledged to OSI that she never reported Lincoln's conduct to management. JA-1141 to 42, she said she told only her co-worker Brunk and didn't come forward. She said she was afraid to come forward, but in saying that, she said, I didn't come forward. JA-609, 924 to 25, 1134 to 35, 1141 to 45, and she admitted the same to her doctors. She didn't come forward, and she also conceded hourly workers weren't supervisors. JA-1111 to 1116. But second, even if Brunk's status were debatable, and it's not, Clem misplaces reliance on some cases where some non-supervisors acted like they were supervisors, so the person telling them had some faith in them. Brunk looked her in the eye, as Judge Keenan said, and said, I'm not, you've got to go tell someone. And she said, I'm not. She didn't. So this isn't an apparent authority case or a chain of command case, and that brings us to the constructive knowledge argument. The conditions were so pervasive, OSI had to know about them. And Clem suggests partly that that's true because there were four victims, even though two of them happened on a prior watch. Two quick points on this. Plaintiff does take significant liberties with timing in this case. Again, two of the attacks occurred before 2012, before OSI ever operated the arsenal. But second, throughout this case, the whole hostile environment argument that they make, half of what's in three-quarters of what's in their brief doesn't apply to Clem. Plaintiff takes 1,000-employee worksite and tries to dredge out every complaint anyone ever raised, including those prior to 2012 and after 2016, whether Ms. Clem knew about the incident or not. And that's a very important point because, as this court said in Honor v. Booz Allen, claims involving others outside the knowledge and the experience of the plaintiff generally don't help establish a hostile environment. Ms. Clem's case should focus on what happened to her. The district court assumed, as we've already discussed, a hostile environment, and the question was imputing notice to BAE. And in that regard, this case is barren. This isn't like Oakletree, where there was no way to make a report, where the HR people's doors were closed and the supervisor was following the victim to the bathroom to make sure she didn't try to report. The channels were not only open and receptive, but OSI reacted immediately to Quisenberry's report and sought out Clem in every regard. Now, Linkus' attacks weren't common knowledge. Suffice it to say that as well. Linkus was clandestine. Almost everyone, including Clem's most supportive witnesses, testified they were shocked to learn of his conduct, had no idea. Flo Bishop, who is the main source of their story, said, I had no idea, J.A. 1725 to 27 and 1732. As to other peripheral events unrelated to Ms. Clem's claims, I do want to say a quick word about the sex ring, even though my whole point is we don't think it's relevant. The main reason we don't think it's relevant is Ms. Bishop said Clem didn't know anything about it. J.A. 1725. Another witness said that at 2028. This was first reported to HR after the Linkus attacks were discovered. Okay, but would it matter whether Clem knew about the sex ring? Isn't the issue whether the employer should have known about it? Well, the employer didn't know either. I'm not wondering what relevance it is. Well, it goes back to Honor v. Booz Allen. I mean, you know, if she doesn't know about it, it's not really part. They have said that it's part of what sent her. Well, can it be part of a hostile work environment if she doesn't know about it, but yet it exists, and her own experience is consistent with that? Her own situation is not consistent for the exact reason that Judge King alluded to. Right, but what I'm saying is. Consensual versus non-consensual. So really the answer is no. I mean, it really doesn't in this case. But I also want to say that many of these alleged trysts, again, date long before OSI. 1687, 1694, 1713, and what's more. All of them are unconfirmed hearsay except for one. That's at 1709. Flo Bishop says, they say, how do you know this? And she's like, I've heard it. Well, one time she said she heard people actually what she thought was having sex. There's just one. And the sex ring that we're told encompasses the entire workforce involved just one woman. How big is the workforce? Over 1,000? Over 1,000, or approximately 1,000. But you're saying when you came in there in 2012, you all were entitled to a completely fresh start? Everything else was washed away? I'm not saying everything is washed away. Like getting baptized or something? Well, it is a fresh start to the extent that we're not liable for what we don't know. And there's no evidence that we knew about this. And let's even go one step further than that. When Flo Bishop sent this notice, what did we do? They say nothing. That's not true. We interviewed the people. We interviewed Stacey Lincas. She denied it. But we also put up a secret camera for a month in the place where she said they were having sex, JA2703, 2708, 2913-14. And nothing happened. So I also want to quickly mention the tumbleweed incident because Mr. Grimes said, oh, this happened, and they laughed about it. Well, they also went to the department heads and it stopped happening. And that's admitted by the woman that made that claim, which, again, was in 2016, long after all of this was involved. And it's at 1870 where she admitted he went to the department heads. So to sum up, OSI had a strong harassment policy in effect. Clem was aware of them and extensively trained on them. And the JA site for that is 1074-76, 1097-1101. She admitted that. They worked well when utilized, and that is a defense to these claims under Barrett and Xerxes. This defense also covers the Barton and Kennett and Clark incidents, where as soon as Ms. Clem let OSI know about the problem, the incident stopped and the coworkers were disciplined. Under Xerxes and Spicer, summary judgment is appropriate, whereas here the employer maintained anti-harassment policies, legitimately investigated complaints, and took prompt, effective remedial action. The respondeat superior argument, we think that it got stronger with the two new cases. There were two recent cases by the Supreme Court of Virginia, Parker v. Carilion Clinic and Our Lady of Peace v. Morgan. Is your position that these four claims are a package deal? There are four claims made by the plaintiff. Your position is they're a package deal. We should reject them all in your view, but they're all good together. Our view is that they should all be rejected. Basically, the negligent retention goes directly to the knowledge question. There's no distinction being made between the state claims and the federal claim. Well, the retaliation claim is the same. I would say that the respondeat claim is the only claim that might have a different life, but it shouldn't have a different life because the law is now, were you doing something in the service of your employer? In a lot of cases, you were doing something in the service of your employer. Here, he was not. Could an employee's sexual assault ever be considered within the scope of an employment? Just asking hypothetical parts in this case. Well, I thought of hypotheticals, and I will give you the crazy hypothetical I came up with. My answer is, first, I would say generally the answer is it shouldn't be because it's always outside the scope. I understand. A masseuse or a masseur who maybe goes someplace where they shouldn't go, would that be in the scope of the job? You're saying only in rare? I could see in a rare case somebody getting there, and I thought maybe you all would ask me that. But generally no, and here especially no. At JA-21-12, he basically described what he did. He lay in wait and dragged her off. And the second time, he was at lunch break and dragged her off. He was not doing anything with his job. I'm over my time, and I thank you very much. Thank you very much, Mr. Friedman. Mr. Grimes? Thank you. All right, just two or three points in response briefly. With respect to my colleague's statement that Clem didn't know about the sex ring, they're just wrong. I turn you to JA-29-97, where Clem talks about her knowledge of the first ring. The first sex ring involved Stacey Lankes. I was aware that Stacey was having sex on BAE property during work hours with members of management, and it was common knowledge this was going on, yet it continued to happen. That's when the second ring developed. She talks about that. While this case was pending because BAE did little or nothing other than interview Stacey Lankes for 15 minutes and put up a camera in an 8,000-acre facility, maybe if a deer walked by, they would catch it. But anyway, there was a second sex ring where women were exchanging sex for money. The ring involved 15 people, and the FBI is investigating that now. And the second point is with respect to sexual harassment training, I turn you to JA-24, excuse me, yeah, 24-57, 24-57, where, hold on, I got the wrong volume, volume 5, volume 5, here it is. Six appendices volumes. Anyway, question, if employees at BAE learn of an allegation of sex harassment, are they supposed to report it up the chain? This is to Stacey Lankes' answer, yes. Question, you're trained to do that answer, yes, so when they didn't do that, that's proof of an ineffective anti-harassment policy. You don't have any training, how are they going to know what to do? So that's the bottom line there. All right, so the final thing with respect to the respondee at Superior, the assault and battery claim, if there's any question about the viability of that claim, I ask you to do what Judge Traxler suggested in his dissent last month in Passaro v. Virginia. He suggested certification of the question. I suggest the same as obviously this is an important question. So look at his dissent, it's one paragraph in Passaro v. Virginia, and follow that recommendation if there's any question. I thank you for your time this morning. Thank you, Mr. Grimes. Yep.
judges: Robert B. King, Barbara Milano Keenan, Joseph R. Goodwin